IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

THE MAYS GROUP, INC.,                )        Civil No. 04-1191-JE
                                     )
                 Plaintiff,          )
                                     )
            v.                       )        OPINION AND ORDER
                                     )
AT&T CORP., a New York               )
corporation,                         )
                                     )
                 Defendant.          )
_____)

        David Paul
        Paul & Sugerman, P.C.
        520 S.W. Sixth Avenue, Suite 920
        Portland, OR 97204-1535
            Attorney for Plaintiff

        Carol A. Noonan
        Timothy R. Volpert
        Lawrence B. Burke
        Davis Wright Tremaine LLP
        1300 S.W. Fifth Avenue, Suite 2300
        Portland, OR 97201
            Attorneys for Defendants

JELDERKS, Magistrate Judge:

OPINION AND ORDER - 1

Plaintiff The Mays Group, Inc. (Mays) brings this action asserting claims for breach of contract and breach of an implied covenant of good faith and fair dealing against defendant AT&T Corporation (AT&T).[1]  Defendant AT&T moves for summary judgment, and plaintiff Mays seeks leave to file a second amended complaint.  For the reasons set out below, AT&T's motion for summary judgment is granted, and plaintiff Mays' motion for leave to amend is denied.

## BACKGROUND

Defendant AT&T provides voice and data telecommunications services to customers throughout the United States.  AT&T markets and supports its services through both independent contractors and AT&T employees who are members of AT&T's direct sales force.  The independent contractors, who are referred to as "Outside Sales Agents," operate under agency agreements with AT&T.  The AT&T employees are designated as part of the "AT&T Direct" sales force.

Plaintiff Mays, a corporation based in Ridgefield, Washington, markets telecommunications services for several telecommunications providers.  Plaintiff Mays became an Outside Sales Agent for defendant AT&T in 1998.  Rebecca Melton-Mays is

---

[1]Plaintiff also asserted a fraud claim which was dismissed earlier pursuant to Fed. R. Civ. P. 9(b), and a quantum meruit claim which was dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

the president and owner of plaintiff Mays.  In addition to
Ms. Melton-Mays, three employees worked for plaintiff between
2001 and 2003.

AT&T's Outside Sales Agents are authorized to sell
different AT&T products and services depending upon the sales
"channels" to which they are assigned.  The contracts or
"agency agreements" between AT&T and the Outside Sales Agents
specify the compensation that Outside Sales Agents can earn.
The compensation rates specified in the agency agreements have
sometimes varied among the different channels and outside
agents.

The "Alliance Channel" is an AT&T Outside Sales Agents
channel.  Plaintiff Mays became a member of the "Alliance
Channel" in 2001.  During 2002, the Alliance Channel agents
were authorized to sell IP, voice, and data services for AT&T.

During the time relevant to this action, Outside Sales
Agents assigned to the Alliance Channel worked through a
computer system called the Sales Management, Agent Revenue
Tracking System or "SMART."  Outside Sales Agents could use
SMART to inform AT&T of their new customer leads, to ask AT&T
to provide the price of services offered to a potential client,
to ask AT&T to prepare contracts for customers, and to access
information about commissions.  SMART was the principal conduit
for communication between AT&T and Outside Sales Agents working
in the Alliance Channel.

OPINION AND ORDER - 3

An Alliance sales agent who was working with a customer to conclude a contract was supposed to enter a "lead" into SMART if the agent reasonably believed that the customer would sign a contract for the services being discussed. The information to be entered included customer contact information, an expected timetable for development of the contract, the types of services to be provided, the customer's expected monthly revenue commitment, and other information the agent had obtained from the customer.

AT&T generally offered "special pricing" to customers who committed to purchase substantial services. Alliance agents typically requested special pricing by entering contract information into SMART, and could not obtain special pricing without providing a significant amount of information concerning the potential customer. Based upon the information provided, the AT&T Field Marketing Manager would indicate the pricing that AT&T was willing to offer. Alliance agents would then typically provide additional information and attempt to secure the lowest possible pricing for the potential customer. This process could be completed in a week for small contracts, and could take more than a year for large contracts. After a potential customer agreed to the contract pricing, the Alliance agent would request, through SMART, that a contract be prepared.

Between September, 2001, and May, 2003, the time during which the events leading to this litigation occurred, the contract between plaintiff Mays and defendant AT&T consisted of a document entitled "AT&T Agency Agreement," a document entitled "Addendum to AT&T Agency Agreement for AT&T Voice Services," and several Appendices.

This action primarily concerns plaintiff Mays' claim that it was improperly denied the opportunity to earn substantial commissions by negotiating a large contract between AT&T and Charter Communications, Inc. (Charter), a large AT&T customer that sells cable services.  Working through AT&T Direct, Charter first became an AT&T customer in 1999.  Certain individual offices of Charter across the United States separately contracted to purchase telecommunications services from AT&T.

Thomas Durrett II, Charter's Director of Transport, Capacity and Network Integration, has submitted two declarations in this action.  Durrett's first declaration includes the following statements:  Durrett was hired in May 2001 "to manage all aspects of Charter's present and forecasted network needs, and control costs associated with Charter's telecommunications services."  In an effort to control costs, in November, 2000, before Durrett was hired, Charter had decided to stop using multiple telecommunications carriers and agents, and to consolidate its telecommunications services.

The management of Charter wanted all orders for AT&T telecommunications services to be placed through the corporate management group in St. Louis, Missouri, to allow Charter to "leverage its new contract with AT&T and to begin building the necessary processes for managing these types of projects." During a subsequent business trip to the Northwest Regional office, Durrett "reinforced to the regional staff, at Charter's Vancouver [Washington] office, that they would not be signing contracts or placing orders with any independent carriers, agents or third party consultants on a go forward basis."

Durrett's first declaration continues as follows:  Two entities, MSI Systems Integrators (MSI), which was an Alliance Channel member, and AT&T Direct, "served as the direct interface to AT&T's network engineering team and provided initial project management while Charter built its team." Durrett does not recall ever meeting any representatives of plaintiff Mays, and would not have offered plaintiff the opportunity to deal directly with Charter's Vancouver office to lease network capacity "in any of its forms as it relates to AT&T's network."  Durrett "would not have authorized any Charter office to work with the Mays Group," because that was inconsistent with Charter's goal of consolidating its telecommunications services and establishing a single national contract to procure such services.  As of September 2002, Charter "was not entertaining a new business relationship with

the Mays Group" or similar organizations.  Durrett never spoke
with anyone working for plaintiff about signing a national
contract with AT&T through plaintiff.

In a second declaration, Durrett states that, to the best
of his recollection, in August or September 2002, he
"telephoned an Alliance Channel manager and requested and
instructed that Alliance partners no longer be involved in
procuring AT&T products or services for any Charter office."

Under § 3.9 of the Agency Agreement, AT&T had the right to
remove customers from an agent's account base "and to reassign
support of such Customers upon such Customer's request."  Under
§ 3.5 of the Agreement, AT&T also reserved "the right to
reject, for any or no reason, any Customer contract or order
solicited by Agent and presented to AT&T for acceptance."

Durrett's assertion that Charter was in the process of
consolidating its purchases of telecommunications services is
consistent with an e-mail "Charter Communications Advisory"
that Charter management sent to Charter offices in November,
2001.  The e-mail asked Charter locations to place new orders
for AT&T circuits through specified account executives with
AT&T Direct and MSI in order to "make the transition from many
regional contracts to national contract seamless."  Durrett's
assertion is also consistent with the deposition testimony of
Rebecca Russell, an AT&T Voice Account Executive and Channel
Manager who worked with plaintiff Mays.  Russell testified

that, in July, 2002, "the Alliance Channel heard from the customer headquarters that [Charter] didn't want any orders placed for Charter unless it came from the direct branch or from MSI."  Russell added that, during a telephone conference call in which she participated, Susan Shaw, Director of AT&T's Alliance Channel Kansas City Support Center, told Ms. Melton-Mays that Durrett had informed AT&T that "he wanted to consolidate all of his AT&T business through MSI in the St. Louis branch."

With the assistance of MSI, Charter signed a national contract with AT&T Direct in May 2001, committing Charter to purchase $69,000,000 in data services from AT&T.[2]  It subsequently added other data and voice services to the contract.

Even after Charter decided to consolidate its purchases of telecommunications services, some Charter regional offices continued to sign individual contracts through outside sales agents.  Charter's Vancouver, Washington office signed a contract, known as the "ABN Contract," with Mays in June, 2001, committing Charter to purchase $60,000 per month in voice services from AT&T.  In June, 2002, Charter's Vancouver office also signed two small contracts for the provision of data

---

[2]Mays does not assert an entitlement to any commission related to that contract.

private lines.[3]   No other Charter office obtained any AT&T
services through plaintiff Mays.

        Around the time Charter's Vancouver office signed the
second contracts, another Alliance agent in the mid-Atlantic
area signed a contract with Charter's office in that area for
data private lines.  According to the declaration of Michael
O'Brien, an AT&T Direct Account Manager who has managed the
Charter account since 2000, that Charter office signed the
contract "prior to getting notice of Charter's consolidation."
AT&T asserts that these purchases from other agents merely show
that the transition to nationwide contracts was slow and
difficult to coordinate, and that Charter's commitment to
consolidation is confirmed by the subsequent conclusion of a
nationwide contract noted below.

        In early 2002, in an effort to consolidate contracted
services for its offices throughout the United States,
Charter issued a Request for Proposal (RFP) to several
telecommunications providers.  Charter did not invite plaintiff
Mays to respond to the RFP on AT&T's behalf, and did not invite
Mays to attend meetings held in various Charter offices
throughout the United States, including the Charter office in
Vancouver, Washington, to discuss the company's
telecommunications needs and technical requirements.

---

        [3]AT&T asserts that the contracts had a value of $2,000.
Plaintiff Mays asserts that they had a value of more than
$10,000.

Ms. Melton-Mays has testified that Mays learned about the RFP
in February 2002 from Scott Gregory, the regional IT manager
for Charter in Vancouver with whom Mays had worked on the ABN
contract.  Melton-Mays acknowledges that plaintiff Mays knew
that Charter did not invite plaintiff to respond to the RFP,
and did not invite plaintiff to meetings Charter held in 2002
to discuss Charter's procurement of telecommunications
services.  Gregory recommended plaintiff Mays to other Charter
offices, but did not have authority to enter into a national
contract on Charter's behalf.  No other Charter office followed
Gregory's recommendation to use plaintiff Mays' services in
purchasing telecommunications services from AT&T.

In September 2002, AT&T announced that, as of November 26,
2002, it would designate certain customers as "AT&T Only"
accounts.  This change was allowed under the Agency Agreement,
and Mays agrees that AT&T could create such accounts after it
posted a proper web notice.  The "AT&T Only" designation meant
that only AT&T Direct would be permitted to sell to and manage
the accounts so designated, and that Alliance Channel Outside
Sales Agents would not be able to continue to sell to or earn
commissions on those accounts.  However, these Alliance Channel
Outside Sales Agents would continue to receive one-time
referral bonuses based upon contracts that the customers
designated as "AT&T Only" signed, if the outside sales agent
recorded the referral lead as "Channel initiated" or "new

referral opportunity" in SMART within a specified time.  The "Channel initiated" label indicated that AT&T Direct was not currently working on the sales opportunity.  The "new referral opportunity" label indicated either incremental revenue or a new service or location that was not already being served by AT&T.

On September 26, 2002, Melton-Mays participated in a telephone conference call that the Alliance Channel held with Alliance agents to discuss the "AT&T Only" program.  AT&T has provided unrebutted evidence that, pursuant to the Agency Agreement, on October 25, 2002, AT&T posted an official notice of the amendment of the Agency Agreement to include the "AT&T Only" program on the "Agency Agreement Updates" section of the AT&T Alliance Channel Web Site.[4]  The notice listed the customers that would be designated as "AT&T Only."  Three of plaintiff Mays' accounts which had contracts with AT&T in effect at that time were designated as "AT&T Only."  These were Charter, Renaissance/Household, and Liberty Northwest.  Melton-Mays acknowledges that plaintiff Mays received an e-mail message that provided notice of the "AT&T Only" program, and an e-mail message to Melton-Mays dated October 15, 2002, included an attached list of "AT&T Only" customers.

---

[4]Catherine Meredith, who was employed by AT&T as an Alliance Channel Contract Manager during the relevant times, has stated in her declaration that the notice was posted at that time.  Melton-Mays has testified that she is not certain that the posting was made, but that plaintiff Mays did receive notice by e-mail.

On October 2, 2002, shortly after the "AT&T Only" program
was announced, plaintiff Mays entered a lead for a Charter
contract into the SMART system.  Between that date and
January 23, 2003, plaintiff Mays entered several separate leads
for contracts with Charter into the SMART system.  No Mays
employees spoke with anyone from Charter other than Gregory, of
the Vancouver office of Charter, about signing an AT&T
contract.  Mays did not request special pricing for any
services through the SMART system during that period, and did
not provide AT&T any information about proposed minutes of use
for a new contract.

AT&T asserts that the only way plaintiff could have made
a pricing request was to go through the SMART system, and notes
that agents could not obtain special pricing without providing
the customer's revenue commitment level, because pricing was
based upon the size of a customer's commitment.  Plaintiff
Mays contends that it rarely used the SMART system to obtain
special pricing because that system usually did not work, and
that it instead obtained special pricing quotations orally from
AT&T employees.  However, Melton-Mays testified that during the
summer and fall of 2002, she realized that even if a Channel
Manager was helping, the only way to make a pricing request was
to go through the SMART system.  In her declaration submitted
in opposition to AT&T's motion for summary judgment,
Melton-Mays asserts that Mays did not provide information about

minutes and commitments because AT&T would not provide Mays special pricing information.  An exhibit attached to Russell's declaration submitted in support of defendant AT&T's reply memorandum in support of the motion for summary judgment shows that plaintiff Mays logged into the SMART system 143 times between September 1, 2002, and October 31, 2002.

On October 23, 2002, after nearly a year of planning and negotiation, Charter signed what is called the "OneNet Contract" with AT&T.  The contract, valued at $135,000,000, was signed through AT&T Direct and MSI, and committed AT&T to provide voice and data services for all of Charter's offices throughout the United States.  The "OneNet Contract" encompassed and superseded all of Charter's earlier contracts with AT&T, including the "ABN Contract" with the Vancouver office procured for AT&T by plaintiff Mays and the earlier $69,000,000 national contract that had been procured by AT&T Direct and MSI.

In a letter dated March 16, 2004, AT&T terminated its agency relationship with plaintiff Mays, effective May 1, 2004.  Section 5.4 of the Agency Agreement provides that either party may terminate the Agreement "without cause upon thirty (30) days' written notice to the other party."

In the present action, plaintiff Mays seeks damages in the amount of $10,600,000.  These damages are based upon commissions that plaintiff Mays alleges are due on the

"One-Net" contract, and bonuses plaintiff alleges are owed on the Charter, Renaissance, and Household accounts.

## PLAINTIFF'S CLAIMS

Plaintiff's first amended complaint alleges that the parties' agency contract provided that plaintiff would market AT&T's products and services, and that AT&T would supply the contracts required for customers to purchase those products and services.  Plaintiff alleges that it satisfied the requirements to earn commissions and bonuses for certain sales, and demanded that defendant AT&T perform its obligations by providing contracts for customers who had indicated their willingness to purchase its products.  Plaintiff further alleges that AT&T failed to provide it the 30 days notice required before amending or canceling "any contract or commission agreement," and that AT&T refused to pay commissions and bonuses after it "completed multi-million dollar transactions with plaintiff's customers that generated sales for which plaintiff had earned substantial commissions."

Plaintiff asserts claims for breach of contract and breach of the implied covenant of good faith and fair dealing.  The breach of contract claim alleges that AT&T breached the parties' agreement by:

1. failing to provide contracts and other necessary support needed for plaintiff's customers to close sales with AT&T, resulting in plaintiff's loss of commissions and bonuses;

2. failing to provide 30 days written notice before amending the parties' agreement in ways that deprived plaintiff of commissions and bonuses; and

3. failing to provide 30 days written notice before canceling the parties' agency agreement.

Plaintiff's claim for violation of the covenant of good faith and fair dealing alleges that AT&T owed it "a duty to act fairly and reasonably in the interests of performance of the contract in conformity with the expectations of the parties." Plaintiff alleges that AT&T violated a covenant of good faith and fair dealing by

1. failing to provide timely notice that it did not intend to allow plaintiff to market products and services to plaintiff's largest customer;

2. failing to provide timely notice of its intent to bring plaintiff's largest customer "in house," depriving

plaintiff of the opportunity to market to that customer; and

3. failing to timely provide pricing information and contracts to plaintiff which would in turn allow plaintiff's customers to purchase AT&T's products through plaintiff.

Plaintiff alleges that defendant AT&T's breach of contract and violation of the covenant of good faith and fair dealing caused it to lose commissions and bonuses in the amount of $10,600,000.

### STANDARDS FOR EVALUATING MOTIONS FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law.  The moving party must show the absence of an issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  The moving party may discharge this burden by showing that there is an absence of evidence to support the nonmoving party's case.  Id.  When the moving party shows the absence of an issue of material fact, the nonmoving party must go beyond the pleadings and show that there is a genuine issue for trial. Id. at 324.

The substantive law governing a claim or defense determines whether a fact is material. T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). Reasonable doubts concerning the existence of a factual issue should be resolved against the moving party. Id. at 630-31. The evidence of the nonmoving party is to be believed, and all justifiable inferences are to be drawn in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1985). No genuine issue for trial exists, however, where the record as a whole could not lead the trier of fact to find for the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## DISCUSSION

I. Breach of Contract Claim

A. Failure to provide contracts and support needed to close sales with AT&T

Based upon the evidence in the record before the court, a reasonable trier of fact could not conclude that plaintiff Mays was deprived of a contractually enforceable right to obtain commissions and bonuses because AT&T refused to provide it the contracts and support needed to close additional sales with Charter during the fall of 2002. There is evidence that Charter's decision in late 2000 to centralize and consolidate its acquisition of telecommunications services and products was

not always smoothly or uniformly implemented, and plaintiff
Mays was able to arrange for sales of AT&T services to
Charter's Vancouver office before the fall of 2002.  However,
the record will support only the conclusion that, during the
time that plaintiff Mays alleges AT&T deprived it of the
opportunity to negotiate the sale of AT&T's products to
Charter, including a contract for Charter's nationwide
requirements, Charter was unwilling to purchase additional
services through plaintiff.

The record establishes that, as early as November 2000,
Charter was working to consolidate its purchases of
telecommunications services, and that plaintiff Mays was not
invited to respond to an RFP Charter issued in early 2002 as
part of that effort.  Agents who were not invited to respond
were not prohibited from arranging for sales to a company that
issued an RFP.  However, Charter's decision not to invite
plaintiff Mays to respond or to participate in meetings it held
in 2002 to discuss its procurement of telecommunications
services is consistent with substantial evidence that Charter
was not interested in increasing its business with plaintiff in
2002, and would not have considered negotiating a nationwide
contract for telecommunications services through plaintiff.

The record establishes that, though Gregory, regional IT
manager at Charter's Vancouver office, recommended plaintiff
Mays to other Charter offices, no other Charter office followed

that recommendation, and Gregory lacked the authority to enter into a national contract on Charter's behalf.  Of more significance to the pending motion, the record includes unrebutted evidence that, before plaintiff Mays entered the leads into the SMART system on which its claims for commissions and bonuses are based, Durrett, Charter's Director of Transport, Capacity, and Network Integration, had "requested and instructed" that "Alliance partners" like plaintiff Mays "no longer be involved in procuring AT&T products and services for any Charter Office."  Before Mays entered the leads in question, the Director of AT&T's Alliance Channel Kansas City Support Center informed plaintiff's president that Durrett had told AT&T that he wanted to consolidate all of Charter's AT&T business through MSI, another Alliance agent.  This is consistent with Durrett's assertions that, as of September 2002, Charter would not consider new business relationships with plaintiff Mays or similar agents, that he would not have offered plaintiff Mays the opportunity to work with Charter's Vancouver office to lease AT&T network capacity, and that he would not have authorized any Charter office to work with plaintiff Mays.

In addition to eliminating sales to Charter through Alliance Channel agents other than MSI, AT&T had announced the "AT&T Only" program before plaintiff Mays began entering the Charter leads in October, 2002, upon which plaintiff's damages

claims are largely based.  This designation meant that Alliance Channel agents like plaintiff would no longer be able to sell AT&T's services to Charter.  As noted above, under the Agency Agreement, AT&T had the right both to designate specific customers as "AT&T Only" and to accede to a customer's request that its account be assigned to a particular Alliance sales agent.

To summarize, the record will support only the conclusion that, by October 2002, when plaintiff Mays alleges that AT&T failed to provide pricing information and necessary contracts and support, Charter had unequivocally decided to consolidate its purchase of telecommunications services through AT&T Direct and MSI, precluding the possibility of the further purchases through plaintiff Mays upon which plaintiff's alleged damages are based.  The record also supports only the conclusion that, when it began entering leads and asking AT&T to issue contracts for it to present to Charter in October, 2002, plaintiff Mays knew that Charter had not issued it an RFP, that Charter had decided not to work with it, and that AT&T intended to institute an "AT&T Only" program.  After Charter indicated that it wanted to purchase telecommunications services only through AT&T Direct and MSI, AT&T was not obligated to work with plaintiff Mays on the Charter account, and any failure to provide contracts and pricing did not breach the Agency Agreement.

The record concerning Charter's determination to consolidate its purchase of telecommunications services and purchase those services only through AT&T direct and MSI is sufficient to establish that plaintiff Mays could not have procured the sale of AT&T services to Charter in the fall of 2002 even if AT&T had provided the support that plaintiff alleges it was denied.  However, AT&T is also entitled to summary judgment on the first prong of plaintiff's breach of contract claim for other reasons as well.  The record establishes that AT&T had been negotiating the "OneNet Contract," consolidating all of Charter's telecommunications purchases, for nearly a year before the contract was signed on October 23, 2002.  This was only a few weeks after plaintiff Mays entered the first leads for the "lost sales" on which this claim is based.  Ms. Melton-Mays, plaintiff's owner, has testified that there was no opportunity for Mays to sell to telecommunications services to Charter after the "OneNet Contract" was signed, and has testified that she does not know whether Charter would have ultimately signed any contracts if AT&T had provided them to plaintiff Mays.  Even if the evidence did not include Durrett's declaration that he would not have allowed any Charter office to negotiate the purchase of telecommunications services through plaintiff Mays during the relevant period, only through impermissible speculation could a trier of fact conclude that Charter would have signed contracts

during the relevant period if they had been presented by
plaintiff Mays.  In addition, the record indicates that agents
like plaintiff Mays could not obtain special pricing from
defendant AT&T without providing AT&T information about the
proposed customer's revenue commitment level, and that
plaintiff Mays did not provide the requisite information.

For the above reasons, defendant AT&T is entitled to
summary judgment on the first prong of plaintiff's breach of
contract claim.


B. Failure to provide timely notice of "AT&T Only" amendment

Plaintiff Mays agrees that AT&T was entitled to take
accounts "in house" by designating them as part of the "AT&T
Only" program, if AT&T provided 30 days notice.

The record includes unrebutted evidence that, on
October 25, 2002, AT&T posted an official notice of the
amendment to the Agency Agreement instituting the AT&T Only
program.  The amendment became effective November 26, 2002.
The notice included a list of AT&T Only customers on the
"Agency Agreements Updates" section of the AT&T Alliance
Channel Web site.  Charter was designated as an AT&T Only
customer on the same day.  Plaintiff Mays does not dispute that
the posting was made.  Melton-Mays testified that she received
notice of the AT&T Only program by e-mail on approximately
October 15, 2002, and an e-mail that she sent to the Channel

Manager in May 2003 states that an update to the SMART system that appeared on October 25, 2002, showed the accounts that were being designated as "AT&T Only."  Plaintiff Mays has not shown the existence of evidence from which a reasonable trier of fact could conclude that, as plaintiff asserts, Charter was not removed from the list of customers with which it was authorized to do business until mid 2003.  Accordingly, defendant AT&T is entitled to summary judgment on the second part of plaintiff's breach of contract claim.

C. <u>Failure to provide 30 days notice before terminating the parties' Agency Agreement</u>

Section 5.4 of the Agency Agreement provided that either party could terminate the Agreement, without cause, "upon thirty (30) days' written notice to the other party." Defendant has submitted evidence that it properly terminated the Agency Agreement by a letter dated March 16, 2004, which ended the parties' agency relationship effective May 1, 2004.

In its response to defendant AT&T's motion for summary judgment, plaintiff Mays admits that AT&T properly terminated the Agency Agreement.

Defendant AT&T is entitled to summary judgment on the third part of plaintiff's breach of contract claim.

D. Damages precluded by Agency Agreement

    Though my conclusion that defendant AT&T is entitled to summary judgment on plaintiff's breach of contract claim for other reasons makes it unnecessary to reach this issue, I note that summary judgment on this claim is also appropriate because the damages that plaintiff seeks on this claim are precluded under the Agency Agreement.  Section 10.2 of the Agency Agreement provides that defendant AT&T

> shall in no event be liable to agent for any incidental, consequential, or any other indirect loss or damage, including lost profits or lost revenues, arising out of or related to this agreement or any obligation resulting therefrom, or the use or performance of any service.

    From both the complaint and the deposition testimony of Melton-Mays, plaintiff's president, it is clear that plaintiff is seeking recovery of the commissions and bonuses which plaintiff asserts it would have earned if its efforts to broker sales to Charter in the fall of 2002 had not been thwarted by AT&T's breach of contract.  In its first amended complaint, plaintiff alleges that defendant AT&T "refused to pay commissions or bonuses" that plaintiff had earned based upon the "OneNet" contract that AT&T completed "with plaintiff's customers that generated sales for which plaintiff had earned substantial commissions."  Melton-Mays testified that plaintiff Mays is seeking damages "for reimbursement for contracts" that plaintiff "was not able to receive from AT&T."  She clarified that these contracts were those plaintiff sought from September

2002 through November 2002, and further testified that the $10,600,000 in damages alleged in the complaint was based upon "contracts that were sold to the customer" for which plaintiff Mays was not allowed to compete.

Agents like plaintiff Mays earned revenue and profits by arranging for the sale of AT&T's telecommunications products and services. Allegations that AT&T's breach of contractual obligations have deprived an agent of income that an agent otherwise would have realized, but for the breach, necessarily implicate the kind of "incidental, consequential, or... other indirect loss or damage, including lost profits or lost revenues . . . referenced in § 10.2 of the Agency Agreement." Because recovery of these damages is specifically excluded under the Agency Agreement, defendant AT&T is entitled to summary judgment on plaintiff's breach of contract claim.

E. Assertion that plaintiff Mays is entitled to commissions on "OneNet" contract

In its opposition to defendant AT&T's motion for summary judgment, plaintiff appears to contend for the first time that it is not seeking the commissions that it was deprived of because AT&T failed to provide the pricing and contract it needed to conclude the "NetOne" contract with Charter, but that it is entitled to commissions because it "provided the pricing" and "procured the buyer."

If these allegations were considered as part of
plaintiff's complaint, defendant AT&T would be entitled to
summary judgment for several reasons.  The record will not
support the conclusion that plaintiff Mays "procured" Charter
as to the AT&T purchases for which plaintiff Mays seeks
compensation.  Charter originally became a customer of AT&T in
1999, working with AT&T Direct, and asked AT&T to work with it
only through AT&T Direct and MSI in the fall of 2002.

The record likewise will not support the conclusion that
plaintiff Mays supplied the pricing used in the "NetOne"
contract.  Indeed, plaintiff's assertions that defendant AT&T
breached the parties' agreement by refusing to provide the
pricing needed to secure a contract with Charter is
inconsistent with this contention.  Further, the Agency
Agreement specifies what requirements must be met, and what
services an agent must perform, in order to earn commissions.
The record supports only the conclusion that plaintiff Mays did
not earn compensation based upon the "NetOne" contract because
it did not broker the agreement between AT&T and Charter, and
because it did not perform the services that agents were
required to perform under the Agency Agreement.

Plaintiff Mays cites Wakefield v. Northern Telecom, Inc.,
769 F.2d 109 (2d Cir. 1985), in support of its assertion that,
under the law of New York, which applies to this action, courts
look to an agent's "efforts and the custom in the industry to

determine when an agent's rights to commissions vest."
However, the <u>Wakefield</u> court stated that the efforts and the
custom in the industry are relevant when the parties' contract
concerning payment of commissions "contains no express
provision detailing when the right to commissions
vests . . . ." Id. at 113. Here, however, the parties' Agency
Agreement explicitly set out the requirements for earning
commissions, and the record supports only the conclusion that
those requirements were not satisfied.

## II. <u>Breach of the Implied Covenant of Good Faith and Fair Dealing</u>

As noted above, plaintiff Mays alleges that defendant AT&T
breached an implied covenant of good faith and fair dealing by
failing to provide timely notice that it did not intend to
allow plaintiff to market to Charter, by failing to provide
timely notice of its intent to bring Charter "in house," and by
failing to timely provide the pricing information and contracts
that plaintiff needed to arrange for customers to purchase
AT&T's products.

Under the applicable New York law, an implied covenant of
good faith and fair dealing exists in every contract. <u>E.g.</u>,
<u>Dalton v. Educational Testing Service</u>, 87 N.Y.2d 384, 663 N.E.
2d 289 (1985); <u>Rowe v. Great Atlantic & Pacific Tea Co., Inc.</u>,
46 N.Y.2d 62, 385 N.E. 2d 566 (1978). This covenant provides

that "the undertaking of each promisor in a contract must include any promises which a reasonable person in the position of the promisee would be justified in understanding were included (5 Williston, Contracts [rev ed, 1937], § 1293, p. 3682)." Rowe, 46 N.Y.2d at 69.  The covenant requires that a party to a contract not take any action that has the effect of destroying the right of the other party to receive the benefit of the agreement.  Dalton, 87 N.Y. 2d 384.  However, the implied covenant of good faith and fair dealing creates no obligations beyond those stated in the contract, Sutton Assocs. v. Nexis-Lexis, 196 Misc. 2d 30, 761 N.Y.S. 2d 800 (N.Y. Sup. 2003), and no contractual provision can be implied which is inconsistent with the terms of the parties' agreement.  Murphy v. American Home Products Corp., 58 N.Y. 2d 293, 448 N.E. 2d 86 (1983).

Plaintiff Mays cannot prevail on the first two elements of its breach of the implied covenant claim because the Agency Agreement specifically provided that AT&T could alter which potential customers an agent could market to, and specified the notice that was required if changes in marketing eligibility were made.  As noted in the discussion of the breach of contract claims above, the record supports only the conclusion that defendant AT&T provided the notice required under the contract.  Plaintiff could only recover on the "notice" allegations in its breach of the implied covenant claim if

notice requirements that differed from those specifically set out in the Agency Agreement were implied.  Because contractual terms that are inconsistent with those set out in that agreement cannot be implied, plaintiff cannot recover on that portion of this claim.

Based upon the record before the court, plaintiff Mays likewise cannot prevail on its allegation that defendant AT&T breached the covenant of good faith and fair dealing by failing to timely provide plaintiff the pricing information and contracts it needed to allow its customers to purchase AT&T's products through plaintiff.  As noted in the discussion of the breach of contract claim, Charter decided that it would obtain AT&T's products and services through another agent and through AT&T Direct during the time in question.  To the extent that plaintiff may have lost revenue because it could not successfully market AT&T's products to Charter from September 2002 on, those revenues were lost because Charter had made a corporate decision to obtain AT&T's telecommunications services through other sources.  The Agency Agreement specifically permitted AT&T to "remove Customers' from Agent's account base and to reassign support of such Customer upon such Customer's request."  In the face of an express contractual provision allowing AT&T to respect a customer's request that it obtain services through particular sources, plaintiff Mays cannot

prevail on a claim of an implied right to continue to market AT&T's products to Charter.

The record simply will not support the conclusion that Charter would have purchased AT&T's products and services through plaintiff Mays during the period upon which this claim is based.  At the time that AT&T allegedly denied plaintiff the support it needed, Charter was on the verge of concluding a large, complex agreement covering all of its offices.  The conclusion that Charter may have altered its decision to purchase only through other sources, and redirected its purchasing through plaintiff at that late date would require an impermissible degree of speculation.

III. <u>Motion for leave to file second amended complaint</u>

On January 20, 2006, five days before the court heard oral argument on defendant AT&T's motion for summary judgment, plaintiff Mays moved for leave to file a second amended complaint.  The proposed amended complaint seeks to add an allegation that defendant AT&T also breached the covenant of good faith and fair dealing by "leaking plaintiff's confidential pricing proposals without plaintiff's permission to provide competing agents with an unfair advantage in securing business with Charter Communications, plaintiff's largest customer."

Under Fed. R. Civ. P. 15(a), leave to amend a complaint "shall be freely given when justice so requires."  Amendment is permitted liberally.  <u>See</u>, <u>e.g.</u>, <u>Chodos v. West Publishing Co.</u>, 292 F.3d 992, 1003 (9th Cir. 2002).  However, courts deny motions for leave to amend which have been unduly delayed, when amendment would result in undue prejudice to the opposing party or the motion for leave to amend is filed in bad faith, or when amendment would be futile.  <u>Owens v. Kaiser Foundation Health Plan, Inc.</u>, 244 F.3d 708, 712 (9th Cir. 2001).

Applying these factors to the present action, I conclude that plaintiff May's motion for leave to file a second amended complaint should be denied as untimely and futile.  Plaintiff's original complaint was filed in August 2004, nearly a year and a half before the motion for leave to amend was filed, and the additional allegations in the proposed amended complaint include matters of which plaintiff was apparently aware when the original complaint was filed.  In its response to the pending motion for summary judgment, plaintiff indicated that by February 2002, it was aware of the "leaking" of price information included in the allegations added in the proposed amended complaint.  In addition, plaintiff's president testified that she knew of the alleged "leaking" when her deposition was taken, which occurred before discovery had closed, and before plaintiff filed an amended complaint, based upon the parties' stipulation, on June 10, 2005.  Plaintiff has

not explained why it did not did not add these allegations much earlier, but instead waited to seek leave to amend again only after defendant had filed a reply brief in support of its motion for summary judgment, and only a few days before the court heard oral argument on the motion. Amendment at this stage in the proceedings is prejudicial to the defendant, and the timing of plaintiff's motion weighs against allowing the amendment. See Schlacter-Jones v. General Telephone of California, 936 F.2d 435, 443 (9th Cir. 1991) (filing motion to amend after discovery complete and summary judgment motion was fully briefed and pending "weighs heavily against allowing leave"). "A motion for leave to amend is not a vehicle to circumvent summary judgment." Id.

It also appears that the amendment that plaintiff proposes would be futile. Plaintiff asserts that it lost potential sales to Charter because of the breach of the implied covenant of good faith and fair dealing set out in the proposed amendment. Because, as noted above, the record supports only the conclusion that Charter was unwilling to purchase additional services from defendant AT&T through plaintiff, plaintiff cannot establish that it was damaged by any sharing of pricing information. In addition, as also noted above, a claim for lost commissions and bonuses is in fact a claim for lost profits that is barred under the terms of the parties' Agency Agreement.

In addition to these problems, the proposed amendment also fails because the record supports only the conclusion that the relevant prices were defendant AT&T's own prices, and AT&T could offer Charter or Charter's agent any pricing that it wished.  When her deposition was taken, plaintiff's president acknowledged that she had not been able to make a nationwide proposal to Charter because AT&T, not plaintiff, developed the pricing.

Under these circumstances, the amendment proposed is futile as well as untimely.

### CONCLUSION

Defendant AT&T's motion for summary judgment (#63) is GRANTED.

Plaintiff Mays' motion for leave to file a second amended complaint (#104) is DENIED.

DATED this 22nd day of March, 2006.


/s/  John Jelderks
John Jelderks
U.S. Magistrate Judge

OPINION AND ORDER - 33